MaD

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 25mj1458-BLM |
|---|---|
| Plaintiff, | COMPLAINT FOR VIOLATION OF: |
| v. | Title 8, United States Code, Section 1324(a)(1)(A)(iii) and (A)(v)(I) – Conspiracy to Harbor Aliens |
| JOHN WASHBURN, | |
| Defendant. | |

The undersigned complainant being duly sworn states:

Beginning on a date unknown and continuing up to the present, within the Southern District of California and elsewhere, JOHN WASHBURN and others, known and unknown, with the intent to violate the immigration laws of the United States, knowing and in reckless disregard of the fact that aliens listed below, had come to, entered, or remained in the United States in violation of law, did conspire to conceal, harbor, and shield from detection such aliens,

| 1 | BYRON VICENTE FELIPE ESCOBAR |
|---|---|
| 2 | DARIO RODRIGUEZ CASAS |
| 3 | LEONARDO RAMIREZ RAMIREZ |
| 4 | ALEJANDRO INFANTE VIZCARRA |
| 5 | JOSE ANTONIO PAEZ SALAZAR |
| 6 | RENE FRAGA PONCE |

all in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iii) and (v)(I).

The complainant further states that this complaint is based on the attached Probable Cause Statement incorporated herein by reference.

_____
Jonatan Ramos
Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 28th day of March 2025.

_____
The Honorable Barbara L. Major
United States Magistrate Judge

2

## STATEMENT OF FACTS

1. I am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure who is engaged in enforcing the criminal laws of the United States. I am a Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and have been so employed since March of 2020. I am a graduate of the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.

2. Before HSI, I was employed as a Border Patrol Agent with USBP from 2007 to 2020. While employed with USBP, I enforced immigration law in a variety of capacities including stints with the Coastal Border Enforcement Team, focusing on maritime alien smuggling investigations; the Targeting and Analysis Unit, identifying smuggling trends and organizations operating in San Diego; and Joint Task Force-West, a task force leveraging DHS components for the purpose of jointly executing operations against transnational criminal organizations.

3. I am currently assigned to the HSI Alien Smuggling Unit (ASU) of the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. HSI ASU is focused on disrupting and defeating alien smuggling organizations operating in the San Diego area of responsibility. HSI ASU works closely with U.S. Border Patrol (USBP), Office of Field Operations (OFO), and Enforcement Removal Operations (ERO) to enhance investigative capabilities and force multiply against transnational criminal organizations seeking to exploit U.S. immigration laws. HSI ASU investigates a wide variety of immigration related areas, such as—illegal immigration, human trafficking, documents and identity fraud, and worksite enforcement.

4. The facts of this probable cause statement are based upon my first-hand knowledge, conversations I have had with other law enforcement officers involved in this investigation and my review of the documentary evidence. The following is a summary of

3

the evidence obtained during this investigation and does not reflect my entire knowledge of the investigation. or all the evidence collected during the investigation. All dates, times, and amounts are approximate.

**A.     Background on BJS & T Enterprises Inc., dba San Diego Powder & Protective Coatings**

5.     BJS & T Enterprises Inc. is a California corporation that filed its articles of incorporation with the California Secretary of State on January 29, 2002.  In a Statement of Information filed on October 23, 2024, BJS&T Enterprises identified its principal address as 1702 N. Magnolia Avenue in El Cajon, California and its business as "metal coatings." It occupies three warehouses and an office suite at this location. BJS & T Enterprises Inc. does business as San Diego Powder & Protective Coatings. Hereinafter, I will refer to BJS & T Enterprises Inc. as "SDPC."

**B.     SDPC's Role as Government Contractor Has Periodically Required It to Electronically Verify Its Employees' Eligibility to Work in the United States**

6.     SDPC performs work under multiple contracts with the federal government. Some of this work is performed pursuant to "prime contracts" where SDPC is in a direct contractual relationship with the U.S. government. SDPC also performs work as a subcontractor where a prime contractor utilizes SDPC's services to perform a portion of the work on a government contract, typically painting or applying coatings as part of a larger contract. For example, SDPC currently has military and government vessels on-site, including a Lighter Amphibious Resupply Cargo 5-ton (LARC-V) amphibious vehicle and an Orca autonomous underwater vehicle (the Orca).

7.     In certain cases, SDPC makes representations to the federal government about the employees that will be performing work under its contracts. For example, in contract number N6247321P3608 signed on August 31, 2021, under subparagraph (b)(36), the contracting officer indicated that SDPC "shall comply" with Federal Acquisition Regulation (FAR) 52.222-54 regarding employment eligibility verification. FAR 52.222-54 requires the contractor to: (i) enroll in the E-Verify program within 30 days of the

4

contract award; (ii) begin using the E-Verify program to verify the employment eligibility of all new employees within 90 days of enrolling in E-Verify; and (iii) use E-Verify to verify the employment eligibility of all employees working on the government contract within 90 days after enrolling in E-Verify or within 30 days of assigning the employee to the contract. FAR 52.222-54(b)(1)(i)–(iii). There are similar requirements for contractors that are already enrolled in E-Verify when they receive a government contract award. *Id.* at (b)(2).[2]

8.      By obtaining E-Verify records for SDPC, investigators learned that SDPC created two separate E-Verify accounts, the first on September 17, 2010, and the second on May 28, 2019. As of March 4, 2025, SDPC never used either E-Verify account to verify the employment eligibility of a single employee despite its contractual obligation to do so.

## C. March 5, 2025: CS Records Conversation with General Manager WASHBURN Regarding CS's Immigration Status and Refers Worker Without Legal Status

9.      On March 5, 2025, HSI Special Agents outfitted a confidential source (the CS)[3] with a concealed audio-video recording device and instructed him to initiate a conversation with General Manager WASHBURN regarding the CS's own immigration status and to recommend a "friend" for employment that lacked legal authorization to work in the United States. When the CS contacted WASHBURN on March 5, 2025, they began by discussing the status of an ongoing project. After that, the following exchange took place:

---

[2] FAR 52.222-54 does have an exception for employees hired prior to 1986. However, since SDPC was not incorporated until 2002, I do not believe any of its employees would fall under this exception.

[3] The CS began cooperating with law enforcement in late 2022. The CS has provided information in several drug trafficking investigations that has been corroborated and determined to be reliable. The CS has been paid approximately $7500 in exchange for information he has been provided and been granted multiple entry parole document during his cooperation and, in January 2025, a request for an employment authorization document was submitted on the CS's behalf. Portions of the information provided by the CS regarding SDPC have also been corroborated. Therefore, I believe the information provided by the CS to be reliable.

5

| CS | You know yesterday, you and me talked? |
|---|---|
| WASHBURN | Yeah. |
| CS | I received one call to my lawyer…and he told me, 'hey hopefully in two or three weeks I will receive my Social Security.' So I can change all my paperwork. No more Aaron. |
| WASHBURN | Really? Is that possible?…that's good news. |
| CS | No, I prefer, because I kind of start to make taxes to everything good you know? |

10.    Based on my training, experience, and knowledge of this investigation, I believe that the CS was telling WASHBURN that his immigration lawyer had told him he would be able to obtain legal immigration status in the next two to three weeks. When the CS referenced "changing his paperwork" and "no more Aaron," he was referring to updating his employment documentation, so he is employed under valid immigration documents (and his own name) instead of the fraudulent paperwork (and fake name) he had been using to work at SDPC for the past several years. "Aaron" is the fictitious name listed on the CS's fraudulent paperwork. WASHBURN's response to this information "that's good news" is consistent with his understanding that the CS obtaining legal immigration status is a positive development for the CS and that the CS is currently working under a fake name ("Aaron"). I further believe that WASHBURN's response to the CS's comments during this conversation corroborate the CS's statements that WASHBURN is aware that the CS—and other workers at SDPC—are employed at SDPC utilizing fraudulent work authorization documents.

11.    Immediately after this exchange, the CS brought up a "friend" that he was referring to work at SDPC. The CS's "friend" is an undercover Special Agent with Homeland Security Investigations. The following exchange took place when the CS brought up his "friend":

6

| CS | I called my friend like ten minutes ago. |
|---|---|
| WASHBURN | Uh-huh |
| CS | And he told me 'hey you have the work or not?' The only thing with him is similar to these guys…" |
| WASHBURN | Drug test? |
| CS | No no no drug test, no no drug test, everything is good. The papers. |
| WASHBURN | Yes, but does…he have…has something? |
| CS | Yeah…y'know, similar to these guys but…. |
| WASHBURN | As long as you can get passed, I don't care. As long as you can show me something I don't care. |
| CS | Yeah, yeah, yeah. Is good worker |

12. Based on my training, experience, and knowledge of this investigation, I believe that this conversation indicates that WASHBURN is aware that a portion of his workers are not authorized to work in the United States, and he does not care as long as they are able to present some kind of document. The CS's initial statement to WASHBURN that his friend is "similar to these guys" was an indirect reference to the CS's friend not having legal status similar to SDPC's other workers. While WASHBURN initially took this statement as a reference to the "friend" having issues passing a drug test, the CS clarified he was referring to his friend's immigration status when he told WASHBURN it is "the papers." In this context, "papers" is a commonly used term to reference immigration documents that are evidence of legal authorization to live or work in the United States. After being told that the friend has issues with his papers, WASHBURN asked if the friend "has something" and the CS again compared his friend to the other SDPC workers (thereby suggesting that other works also have issues with their "papers"). WASHBURN's response is telling as he said, "as long as you can show me something, I don't care." In totality, I believe this exchange demonstrates that WASHBURN does not care about hiring

employees that do not have "papers" as long as they can present something to him. The CS's repeated references to WASHBURN that his friend is similarly situated to other workers at SDPC during this conversation also appear to indicate that he is aware that SDPC is currently employing multiple people without documents authorizing them to work at SDPC ("papers").

13.    As they continued to speak, the CS referenced to WASHBURN that he had recently lost two guys and WASHBURN responded "Right now we just need people...we need people to sweep, blast...just the little shit, y'know? The little shit. Uh...but that's why we gotta, we're on that page...[inaudible]...Phil [Phil Johnson the Chief Executive Officer]—he, he gets all mad he goes 'I want...they have to speak English, and they have to be from here.'" The CS responds that his friend will speak English and then WASHBURN continued by saying, "No, but that's what he *says* but I'm like okay okay and then I come to you" (emphasis added to reflect WASHBURN's intonation). The CS then repeated his friend will speak English and then WASHBURN said, "beautiful and then we win."

**D.    March 19, 2025: Undercover Agent Records Conversation with HR Manager as He Presents Fraudulent Documents**

14.    On March 19, 2025, a Special Agent with Homeland Security Investigations approached SDPC's office to apply for a job in an undercover capacity (the UCA). On this date, the UCA carried a fraudulent Permanent Resident card bearing the name Julio Cesar Garcia and an alien registration number ending in -642, along with a fraudulent Social Security card bearing a social security number ending in -7986. These documents were not produced by the U.S. government and were obtained during an undercover operation on February 25, 2025, from an individual that sells counterfeit identification documents.

15.    When the UCA entered SDPC, he encountered an employee, K.B. While K.B. is not listed on the SDPC website, her business card identifies her title as "Operation Manager." K.B. provided the UCA with an application for employment and left him alone

8

to complete the application. She instructed him to slide it under her door once he completed it.

16.     As the UCA completed the application, he sent the CS a message asking him to come and help him submit the application. The CS came over and calls to "Karli" and says, "he is my friend" and asks if "John [WASHBURN] told you." In response, K.B. comes out and asks the UCA if he has completed the application. He responds affirmatively and she asks him for identification documents. In response, the UCA provided K.B. with the fraudulent documents he had previously obtained under the name Julio Cesar Garcia. Almost immediately upon being handed the documents, K.B. looked at them and exclaimed "Oh boy, more of these." K.B. then took the documents, made copies, and returned them to the UCA without saying anything else about the documents.

17.     Based on my training, experience, and knowledge of this investigation, I believe K.B.'s comment about "more of these" indicated that she knew she was receiving fraudulent documents as evidence of employment. There would be no reason for such a comment in response to receiving another set of valid employment documents. However, such a comment is more understandable in response to receiving another set of fraudulent employment documents.

E.     **March 24–25, 2025: The UCA Begins Working at SDPC**

18.     On March 24, 2025, the UCA reported to SDPC to complete his new hire paperwork and begin his first day of employment at SDPC. He met with Operation Manager K.B. to complete his new hire paperwork. The UCA stated that he does not recall being asked to complete a Form I-9 to verify his authorization to work in the United States, a Form W-4 to set the amount of taxes withheld from his paycheck, or being informed how much he would be paid for his work at SDPC.

19.     During the UCA's first two days of employment (March 24–25), SDPC had military and government vessels on-site, including a U.S. Navy amphibious vehicle LARC-V and an Orca autonomous underwater vehicle (the Orca). During the UCA's first two days of employment, he was tasked with working on these projects involving military equipment.

9

20.    During the UCA's first two days on the job, he began to make conversation with another employee that he worked alongside. This unidentified employee (the UE) told the UCA that he just began working at SDPC the week before. The UE went to tell the UCA that he crosses the border using a visa. He added that there are only a few places that will accept "crooked" documents and commented on the poor quality of his own fake documents. The UE added that there are other undocumented people working there as well.

21.    The UE also commented to the UCA that there are three employees that sleep in an office inside one of SDPC's buildings. However, the UCA was not able to personally confirm this during his first two days on the job.

22.    I spoke with the CS regarding three employees living and sleeping on the premises. He stated that he had seen the room where individuals were living and had observed three beds. The CS pointed out the room to the UCA but the was not able to get access to the room to verify whether there were indications people were living in it.

**F.    March 27, 2025: Search of SDPC's Warehouses Uncovers Three People Living in Converted Office Space**

23.    During the execution of a search warrant on March 27, 2025, law enforcement confirmed that three individuals were living inside one of SDPC's warehouses, 1730 N. Magnolia Avenue, inside a conference room that had been converted into living quarters. This warehouse included areas designated for the use of multiple other employees such as an employee break area. The western portion of the warehouse contained a large inventory room with various supplies, and large room where two military projects appeared to be set up for painting.

24.    Inside the warehouse area where the military equipment was stored, there was a staircase that led to two second-floor rooms inside the warehouse space.  One of these rooms appeared to be a file room. The other room appeared was the converted living quarters.

10



Room converted
to living quarters

25.    When law enforcement entered this room, it was filled with indicia that it was being used as a living space and not for business purposes. The room contained three "beds" although one appears to be an actual bed, one appears to more akin to a cot bed, and the third is just a pad on the floor with blankets. The room also contained a television, a small refrigerator, a microwave, and racks with clothes hanging on them. The whiteboard contained a series of words written in English and Spanish.

*Inside of Living Quarters in Warehouse*

 

26.    The CS had previously identified the individuals living in this area as materials witnesses Alejandro INFANTE Vizcarra, Byron Vicente Felipe ESCOBAR, and a third person Jovanni C. While SDPC records confirmed the existence of an employee named Jovanni C., he appears to have fled the area and evaded apprehension during the execution of the search warrant.

**G.    March 27, 2025: Interviews of Material Witnesses Living in Warehouse**

*VIZCANTE Identifies WASHBURN as the Person that Gave Him Permission to Live in the Warehouse*

27.    Following his detention, VIZCARRA was interviewed by federal law enforcement. He stated that he had been employed at SDPC since on or about August of 2024 and admitted to presenting a fraudulent California driver's license and fraudulent social security card to obtain employment at SDPC. VIZCARRA said he completed the application and interview with SDPC Manager K.B. VIZCARRA said he obtained employment at SDPC using a fake name, "Guillermo Martinez," that was listed on his fake driver's license and Social Security card, and appeared on his SDPC paystubs.

28.    VIZCARRA said he was living at SDPC in the room converted to living quarters, along with two other aliens, "Byron Escobar," and "Jovanni [Jovanni C.]." VIZCARRA said he approached Defendant John WASHBURN to ask for permission to live on-site and WASHBURN was the person that granted him permission. VIZCARRA said he did not pay rent to live in the warehouse and did not believe the other two aliens living there paid rent either.

29.    VIZCARRA stated that he was aware of multiple other aliens working at SDPC because he had asked around. VIZCARRA said he did not know who in management might be aware of how many SDPC employees were aliens.

*ESCOBAR*

30.    Following his detention, agents interviewed Byron Vicente Felipe ESCOBAR. ESCOBAR said he had been employed at SDPC for approximately 18 months. ESCOBAR said he only used his Guatemalan passport to secure employment at SDPC and denied using

fraudulent American documents.[4] Though he initially denied living at SDPC, ESCOBAR later admitted that he had been living at SDPC for around one to two months, along with two other individuals, "Guillermo" (VIZCARRA's false first name) and Jovanny C.'s last name.

31. ESCOBAR said a supervisor[5] who is no longer employed at SDPC gave him permission to live in the warehouse. ESCOBAR further said he did not pay rent to live in the warehouse. ESCOBAR said the "owner" was aware that he was living in the warehouse and the "owner" was aware that he did not have documents that would allow him to legally work in the United States. ESCOBAR also said he has dealt with other people in human resources that he believes are aware he does not have lawful documents.

**H.   March 27, 2025: Material Witness Jose Antonio Paez SALAZAR States WASHBURN Was Aware He Did Not Have Documents to Legally Work in the United States**

32. After his detention, SALAZAR was interviewed by law enforcement. He said he had been working at SDPC for approximately five years and most people at the company referred to him as "Don Gallo." SDPC records indicate he was working under the name "Javier Garcia." He said he primarily worked on painting ships for the company. He identified his boss as Defendant John WASHBURN and stated that he believed WASHBURN was aware he was in the country illegally, although he did not articulate exactly how he knew WASHBURN was aware of this.

**I.   March 27, 2025: Material Witness Rene FRAGA-Ponce**

33. After his detention, FRAGA was interviewed by law enforcement. He said he had been working at SDPC for approximately five days. He said he completed his application with a "white lady" and he filled out the forms and she instructed what to write

---

[4] During a search of SDPC's records, agents found a photocopy inside ESCOBAR's employment file containing copies of a fraudulent Permanent Resident card and Social Security bearing ESCOBAR's name.

[5] Believed to be Armando Perez-Perez who was charged as a deported alien found in the United States in February of 2025. Case Number 25mj668.

on some of the forms. Although he had only been there five days, he said he knew about three people living on-site and knew that most of the workers were in the country illegally from the people he talked to.

**J.      March 27, 2025: Around One-Third of SDPC's Workers Are Identified as Lacking Legal Authorization to Work in the United States**

34.    During the execution of a search warrant on SDPC's premises on March 27, 2025, agents identified approximately 50 total individuals present at the company's location. During the course of identifying these 50 individuals, agents learned that two employees could not be located, including Jovanny C. who is believed to have been one of the individuals living on-site. Of these 50 individuals, approximately 15, not including the CS or the UCA, were identified as lacking legal authorization to work in the United States.

35.    Based on the foregoing, there is probable cause to believe that John WASHBURN conspired with other members of SDPC's management to harbor aliens, while in knowing and/or reckless disregard of the fact that they had entered, come to, or remained in the United States without lawful authorization.

36.    The complainant states that the names of the material witnesses are set forth below:

|   | Name | Country of Citizenship |
|---|---|---|
| 1 | BYRON VICENTE FELIPE ESCOBAR | Guatemala |
| 2 | DARIO RODRIGUEZ CASAS | Mexico |
| 3 | LEONARDO RAMIREZ RAMIREZ | Mexico |
| 4 | ALEJANDRO INFANTE VIZCARRA | Mexico |
| 5 | JOSE ANTONIO PAEZ SALAZAR | Mexico |
| 6 | RENE FRAGA PONCE | Mexico |
| 7 | JUAN JESUS TAPIA CONTRERAS[6] | Mexico |

---

[6] Tapia-Contreras possessed a border crossing card allowing him to cross the border, but not work in the United States and so is not currently named in the charge in Count 1. However, we are still seeking to hold him as a material witness to secure his availability as a witness and believe he has information material to the criminal case.

14

37.    Further, the complainant states that the Material Witnesses are citizens of countries other than the United States, that with the exception of Tapia Contreras, they do not have legal authorization to remain in the United States, that their testimony is material, that is impracticable to secure their attendance at trial by subpoena, and that they are material witnesses in relation to this criminal charge and should be held or admitted to bail pursuant to Title 18, United States code, Section 3144.

15